IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

HUDSON ENTERPRISES, INC.,
d/b/a River Valley Marina                                      PLAINTIFF

v.                          No. 4:15-cv-12-DPM

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON INSURANCE COMPANIES, Subscribing
to Policy #10NCG01559 and Agreement Numbers
NPPI1011456 and NPPI09112456                                   DEFENDANT

ORDER

1. Seven inches of rain fell in the Little Maumelle River basin the night of 30 April 2011. By morning on May 1st, the river had come out of its banks. It covered some of the parking lots at the River Valley Marina, as well as the ramps connecting several floating docks to the shore. There was heavy wind, too. Five of the docks were lost that morning. They were covered by an insurance policy that excluded losses "caused directly or indirectly" by flood. The Marina argues that, as a matter of law, the dock loss wasn't caused by flood. The insurers, Certain Underwriters at Lloyds London, argue that, as a matter of law, it was.

2. **The Policy.** River Valley Marina is the doing-business name of Hudson Enterprises, Inc., a corporation owned by Ray and Debra Hudson. The Marina bought a commercial property insurance policy from the

Underwriters in January 2011. The one-year policy covered eight of the Marina's docks, labeled A, B, C, E, F, G, I, and O (there was no H dock). The policy had exclusions. This section said:

### SECTION III – EXCLUSIONS

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage affecting a substantial area, or remains localized – even when restricted to the insured premises.

\* \* \*

    4.    **Water –**

        (a) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not[.]

№ 34-3 at 9. The parties argue over how to apply this flood exclusion.

**3. What's a flood?** The first question is whether the Court can interpret and apply this policy as a matter of law. It can. The Marina argues that the policy is ambiguous, because it doesn't define "flood." And, the Marina continues, because the language is ambiguous, it must be construed against the Underwriters. But an undefined term isn't automatically ambiguous. *Essex Insurance Co. v. Holder*, 372 Ark. 535, 537, 261 S.W.3d 456, 458 (2008).

Mr. Hudson, for example, said the policy's flood language was clear; so did Mrs. Hudson. *№ 48-1 at 71 & 48-7 at 23–24.*\* Besides, the Marina and the Underwriters urge the Court to adopt the same definition of "flood": the one used by the Arkansas Court of Appeals in *Ebbing v. State Farm Fire & Casualty Co.*, where that Court found the term unambiguous in a similar policy provision. 67 Ark. App. 381, 386, 1 S.W.3d 459, 462 (1999). This Court therefore holds that this common term in this policy is unambiguous. So the policy's construction and legal effect are questions of law. *Southall v. Farm Bureau Mutual Insurance Co. of Arkansas*, 276 Ark. 58, 60, 632 S.W.2d 420, 421 (1982).

What, then, does the policy mean by flood? *Ebbing* tells us:

> "Flood waters" are those waters above the highest line of the ordinary flow of a stream, and generally speaking they have overflowed a river, stream, or natural water course and have formed a continuous body with the water flowing in the ordinary channel[.]

67 Ark. App. at 386, 1 S.W.3d at 462 (quotation omitted).

**4. Did a Flood Cause the Dock Loss?** The parties agree that the Underwriters must prove that the flood exclusion applies. *№ 47 at 6.* Here

---

\*All deposition citations are to deposition pagination.

are the undisputed facts, and, where disputed, the facts in the light most favorable to the Marina. *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

River Valley Marina sits on the north bank of the Little Maumelle River. The Marina is about two miles above the Little Maumelle's confluence with the Arkansas River. *№ 34-3 at 78 & 48-3 at 4*. Most of the water falling into the Little Maumelle basin drains into the River upstream from the Marina. In 2011, between 9:00 p.m. on April 30th and 3:00 a.m. on May 1st, more than seven inches of rain fell in the basin. *№ 34-3 at 78*. This was a 300-year rain event. As Mr. Hudson put it: "It rained for three days. Hard. I mean it just one, one storm after another storm." *№ 48-3 at 3*. When you get that kind of rain, he said, "you're fixin' to have problems." *№ 48-3 at 4*.

Mr. Hudson made it to the Marina around 1:00 a.m. on May 1st. When he got there, he "found water already higher than I had ever seen it around, as far as the amounts of the rain that had fell." *№ 48-3 at 2*. He started getting people off their boats and getting campers moved to higher ground. His stepson, Phillip Tidwell, helped. *№ 48-6 at 36–37*. Soon the river had doubled in speed. By 3:00 a.m., "it had come up a couple of feet and was beginning to really roll[.]" *№ 52 at 2*. At 4:00 a.m., according to Mrs. Hudson, the river was

a little over its banks. № 48-7 at 90. By daylight, there was six inches of water in the parking lot in front of E dock. № 48-1 at 134 & 48-7 at 91. Water was starting to cover the gangplanks between the docks and the shore. № 48-5 at 29. Water wasn't the only problem; there was wind too. The wind on May 1st was probably the strongest Mr. Hudson had ever experienced. № 48-1 at 173. It nearly pushed his wife into the river. № 48-7 at 77. And it left tree limbs strewn across the ground. № 48-5 at 47.

Tidwell took some photographs of E dock after daylight; these will be important later. Then, sometime later that morning, Tidwell heard creaking and popping and turned and saw docks starting to leave the bank. № 48-6 at 44, 46–47, 70. (Neither of the Hudsons saw any docks leaving.) Five docks were lost: E, F, G, I, and O. № 48-7 at 34. The others were mostly undamaged.

A few days after the loss, the Underwriters sent an adjuster, Mark Gray, to take photographs and talk to the Hudsons. Toward the end of their talk, Gray asked Mr. Hudson what was "the reason or the cause of the docks pulling loose." № 48-1 at 312. Hudson answered: "The velocity of the water." *Ibid.* This answer was part of a taped statement, but Gray didn't record all his conversation with the Hudsons. They talked for about 20 minutes before the recorder started running. During that time, the Hudsons

told Gray about the high wind. They told him the wind was blowing at "an unbelievable amount." № 48-7 at 44. They also told him about a dock tenant who nearly lost her little dog to the wind. *Ibid.*

The Underwriters informed the Marina in late May 2011 that they questioned coverage, based mostly on the Hudsons' statement to Gray about the fast-moving water. № 34-3 at 35. In late June, they denied the claim. № 34-3 at 40. The Underwriters blamed the loss on "a flash flood that occurred on the Little Maumelle River following heavy rains." *Ibid.*

Later that summer, though, Mrs. Hudson was going through the photographs on her camera and happened to find the ones Tidwell had taken on May 1st. № 48-7 at 37. (He'd used her camera.) These photos are at № 48-7 at 145–49 in the record. They show a power pole crashed into E dock. The power-pole situation changed Mr. Hudson's mind about what caused the loss. № 48-1 at 128. It was actually caused, Mr. Hudson came to see, by the power pole. "[I]t split the [E] dock in half, and from there down, everything is gone." № 48-1 at 184. "[I]f the pole hadn't hit the dock, they'd still be there." *Ibid.* This fallen pole was, according to Mr. Hudson, a symptom of the great wind. Thus, the sole cause of dock coming free was wind: "Just the wind — the wind and the tree limbs and the velocity of the wind." № 48-1 at

*186.* The Hudsons now deny that water had anything to do with the loss. *№ 48-1 at 185–86 & 48-7 at 76.*

Apart from the wind, however, this record shows a flood. To use the parties' definition from *Ebbing*, on May 1st the waters of the Little Maumelle at the Marina were "above the highest line of the ordinary flow[.]" They had "overflowed a river, stream, or natural water course and [had] formed a continuous body with the water flowing in the ordinary channel[.]" 67 Ark. App. at 386, 1 S.W.3d at 462.

The best way to understand all this is through the photographs. Tidwell's May 1st photo of E dock says a lot. It's appended to this Order. The parking lot is in the bottom left-hand corner. *№ 48-7 at 91.* It's underwater. *Ibid.* Mr. Hudson testified that the base of the fallen power pole, which is underwater in this photo, is usually not in the water. *№ 48-1 at 129–30.* The land-end of the dock's gangplanks are underwater. *Ibid.* Compare this photo with one that Gray took on May 5th. It shows where E dock used to be, and it shows the gravel parking lot—dry four days after the storm—above the river, outside the banks. *№ 48-1 at 152, 191.* This photo is also appended. Another set of photos shows a tree that was nicked by the corner of a dock being carried down river. *№ 48-1 at 160, 199.* That dock's track shows where

the water's edge was on May 1st. *№ 48-1 at 160*. In the Gray photos, the water level is back to normal: about three feet below where it was on May 1st, and about a foot-and-a-half below the bank. *№ 48-1 at 160–61*. (This last point, about the normal flow line, means there was a flood under both the "outside the banks" and the "highest line of ordinary flow" definitions from *Ebbing*. 67 Ark. App. at 386, 1 S.W.3d at 462.)

Mr. Hudson later agreed that the river had flooded. *№ 48-1 at 117, 200*. Mrs. Hudson also said that, at least in a few areas, the water exceeded the banks. *№ 48-7 at 75*. Tidwell added that there was water in places that were normally dry. *№ 48-6 at 21*. When he took the photographs, he recalled, the river was overflowing its banks. *№ 48-6 at 57*. James Blansett was living on a boat at the Marina at the time. He said the water was over the shoreline of the river; it was up on land that's normally dry. *№ 48-5 at 20, 26, 56–57*.

In response to all this, the Marina emphasizes something said by the Underwriters' expert. He looked at Tidwell's May 1st photographs and said the river was flowing "bank-full." *№ 34-3 at 79*. And his report assumed the stream was flowing "within its banks." *Ibid*. This looks like a conflict with the Underwriters' theory of the case. But it's not. For one thing, the expert equivocated. He said there was "clearly some flooding along the banks."

*Ibid.* More importantly, his assumption was for a limited purpose: calculating the water's velocity. *Ibid.* The point is that he didn't attribute any current to the water outside the banks. Nor does the Marina's distinction between low banks and high banks make its case — even if the parking lots were low banks, they still were under six inches of water. On May 1st, then, there was a flood at the Marina.

The remaining dispute is whether this flood directly or indirectly caused the dock loss. Did the flood, in a natural and continuous sequence, produce the loss, and would the loss have happened without the flood? *New Hampshire Insurance Co. v. Frisby*, 258 Ark. 39, 43, 522 S.W.2d 418, 420 (1975).

This flood caused this loss. Underwriters' expert, Mark Saunders, said that all that rain on April 30th and May 1st flowed through the river with extraordinary force. There was 75,000 to 110,000 pounds of force on the docks that morning. № *48-16 at 14*. The docks were held to shore with thick aircraft cable. № *48-1 at 311 & 48-16 at 14*. The cable carried most of the weight, but its break strength was 14,400 pounds. № *48-1 at 311*. These well-built docks were simply outmatched by the water. Mrs. Hudson told Mark Gray as much. She said they'd built these docks to withstand whatever Mother Nature had to offer, but that they underestimated her this time. № *48-1*

*at 313.* Hudson blamed the dock loss on "the velocity of that water." *№ 48-1 at 312.*

The Marina is right that Saunders focuses on current, not high water. But as Saunders says in his affidavit, the two are inseparable: "[T]he flood brought with it, and was the cause of, the current velocity[.]" *№ 48-16 at 3.* Current is what made this flood different from other floods where the Arkansas has backed up into the Little Maumelle. *№ 48-6 at 99–100.* The 2011 flood was exceptional because the water level at Murray Lake was as low as the Corps of Engineers usually allows. *№ 48-16 at 9–10.* The Corps was planning for all the rain. The upshot is that the Little Maumelle got only inches, as opposed to feet, into the Marina's parking lots, but it flowed much faster on its path to the Arkansas. *№ 48-16 at 10.* The Marina's dock loss, in summary, was caused by flood.

A word about wind. Viewing things in the light most favorable to the Marina, wind played a role in the loss of these five docks. But that fact doesn't change the legal result. This policy says that even if flood wasn't the sole cause, the exclusion still applies. *№ 34-3 at 9.*

\* \* \*

The Marina's motion for summary judgment, № 34, is denied. Underwriters' cross-motion, № 46, is granted. The second amended complaint will be dismissed with prejudice.

So Ordered.

*[signature]*
D.P. Marshall Jr.
United States District Judge

25 May 2016



**American Claim Solutions, Inc.**

178 Amanda Place
Hot Springs, AR 71901



6    147    5/5/2011    Taken By: Mark Gray
Dock missing from this location.

ACS9311    5/10/2011    Page: 3

EXHIBIT 7    UWRV 000847